1
2
3
4                        UNITED STATES DISTRICT COURT
5                      NORTHERN DISTRICT OF CALIFORNIA
6
7    DING DING,                               Case No.  24-cv-01368-JSC
8                    Plaintiff,
                                              **ORDER RE: DEFENDANTS' MOTION**
9           v.                                **TO COMPEL ARBITRATION**
10   STRUCTURE THERAPEUTICS, INC., et         Re: Dkt. No. 24
     al.,
11
                     Defendants.
12

13          Plaintiff Dr. Ding Ding brings claims against Defendants for creating a hostile work

14   environment and ultimately terminating her employment because of her race, her sex, and because

15   she is a victim of domestic violence.  (Dkt. No. 1 at 9-39.)[1]  Before the Court is Defendants'

16   motion to compel arbitration.  (Dkt. Nos 24.)  Having carefully considered the briefing, and with

17   the benefit of oral argument on June 26, 2024, and again on October 3, 2024, the Court would

18   DENY Defendants' motion to compel arbitration.  Plaintiff's case is covered by the End Forced

19   Arbitration Act and she has timely elected to invalidate the relevant arbitration agreement.  But to

20   give Plaintiff the opportunity to amend her complaint, the Court defers a final ruling on the motion

21   to compel arbitration.

22                                **BACKGROUND**

23   **A.  Complaint Allegations**

24          In November 2021, Plaintiff accepted Defendants' offer of employment to serve as the

25   Chief Financial Officer at Structure Therapeutics, Inc. (then "ShouTi, Inc."), a clinical drug

26   development company ("the Company").  (Dkt. No. 1 at 12 ¶ 11, 16-17 ¶ 28.)  Around that time,

27   _____

28   [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

United States District Court
Northern District of California

the Company's Chief Executive Officer, Defendant Stevens, assigned Plaintiff responsibilities already being performed by others so each of Plaintiff's job duties as Chief Financial Officer "was shared with someone else and nothing was 100% her responsibility.  He noted that it would appear to her that there is 'no need for her.'"  (*Id*. at 17 ¶ 29.)  When Plaintiff began working at the Company in December 2021, Defendant Stevens "almost immediately began to sideline Dr. Ding and not allow her to perform the primary functions of her position, including managing and interfacing with lead investment banks who were serving the Company as part of the [Initial Public Offering]."  (*Id*. at 18 ¶ 33.)  "Defendants also pigeonholed Dr. Ding's job duties and narrowed her already limited scope of tasks to business development in the Asian markets and limited investor outreach in Asia."  (*Id*. at 18 ¶ 34.)  In January 2022, Defendant Stevens told Plaintiff "some of the male investment bankers from the Wall Street banks who were servicing the Company's [Initial Public Offering] efforts had complained that Dr. Ding was 'too aggressive' and 'lectured' them."  (*Id*. at 19 ¶ 35.)  Defendant Stevens "adopted and ratified" these complaints, "and later would use such sexist opinions to form a pretextual basis for terminating Dr. Ding."  (*Id*.)

On March 7, 2022, Plaintiff was the victim of a domestic violence incident that resulted in her calling 911, filing a police report, obtaining medical treatment, meeting with the New York Police Department for the ensuing investigation, and seeking safe accommodation away from her home.  (*Id*. at 22 ¶ 43.)  Plaintiff suffered visible, significant facial and ocular trauma from the incident.  (*Id*. at 23 ¶ 44.)  She informed the Company of the incident and discussed potential accommodations.  (*Id*.)  Referring to Plaintiff's visible injuries during a Zoom call, Defendant Stevens commented, "I can hardly see anything.  You may be more sensitive to it than others."  (*Id*. at 23 ¶ 46.)

Five days later, after Plaintiff had traveled to the Company's San Francisco headquarters for a week of executive meetings, Defendant Stevens began to repeatedly ask Plaintiff to reconsider her role as Chief Financial Officer.  (*Id*. at 23 ¶ 48.)  On March 15, 2022, Defendant Stevens "raised no performance-related concerns, but asked Dr. Ding whether she would reconsider her choice of being a biotech [Chief Financial Officer], in light of her recent domestic

violence incident." (*Id*. at 23 ¶ 49.)  Plaintiff affirmed she was capable and would continue in her position, as she saw no reason her personal situation should bear on her career.  (*Id*.)  Nevertheless, Defendant Stevens continued to pester Plaintiff about reconsidering her role "given her 'transition in life.'"  (*Id*.)  On March 22, 2022, Defendant Stevens terminated Plaintiff without providing any performance-related reason for her termination; instead, he "called out Plaintiff's domestic situation as a factor in his decision to terminate her employment."  (*Id*. at 24 ¶ 51.)

Plaintiff accuses Defendants of (1) sex discrimination in violation of California law, (2) creating a hostile work environment in violation of California law, (3) discrimination and retaliation against a victim of domestic violence under California law, (4) discrimination and retaliation against a victim of domestic violence under New York law, (5) wrongful discharge, (6) breach of the covenant of good faith and fair dealing, and (7) promissory estoppel.

**B.  Procedural History**

Plaintiff first initiated this action by filing an arbitration demand with JAMS on October 6, 2022, in which she asserted the same claims she brings now except for her sex-based claims. (Dkt. No. 24-8 at 24-44.)  Arbitration was formally initiated on November 18, 2022.  (24-11 at 2.) On January 18, 2023, the arbitrator held a preliminary hearing and issued a scheduling order that set phase one of the arbitration for February/March 2024.  (Dkt. Nos. 24-7 ¶ 14; 24-19 at 3.)  From March 2023 to October 2023, the parties exchanged amended pleadings, briefed the Company's motion to dismiss the New York claims, and "engaged in extensive discovery and meet and confer efforts." (Dkt. No. 24-7 ¶¶ 15-20.)  The arbitrator denied this motion to dismiss.  (*Id*. ¶ 15.)

On October 20, 2023, Plaintiff asked the arbitration provider for an update regarding the payment of arbitration fees. (Dkt. Nos. 24-7 ¶ 21; 24-27 at 2.)  Five days later, Plaintiff issued a Notice of Withdrawal from Arbitration, purporting to withdraw due to Defendants' alleged material breach under California Code of Civil Procedure § 1281.98 because Defendants paid the arbitration fees four days too late. (Dkt. Nos. 24-28 at 2; 24-7 ¶¶ 22.)  The arbitration was then closed. (Dkt. No. 24-30 at 2.)  After arbitration was closed—and at Defendants' request—the parties engaged in private mediation, as well as additional discovery.  (Dkt. No. 25-1 at 4, ¶ 14.)

Plaintiff subsequently initiated this action in California Superior Court in March of 2024,

1  adding for the first time allegations of sex-based discrimination under New York and California

2  law and a sex-based hostile work environment claim under California law.  (Dkt. No. 1 at 9.)

3  Defendants removed the action to this Court. (Dkt. No. 1.)

4      Defendants then moved to compel arbitration.  (Dkt. No. 24.)  In her written opposition,

5  Plaintiff for the first time asserted the End Forced Arbitration Act (EFAA) invalidated the

6  arbitration agreement.  (Dkt. No. 25 at 13.)  The Court heard argument on June 26, 2024.  (Dkt.

7  No. 41.)  Because the EFAA issue was not sufficiently briefed, the Court ordered the parties to

8  submit supplemental briefing.  After a second round of briefing, the Court heard further oral

9  argument on October 3, 2024, and took the motion under submission.  (Dkt. No. 55.)

10                                    **DISCUSSION**

11      Plaintiff's employment contract to serve as the Company's Chief Financial Officer

12  includes an arbitration clause requiring all disputes relating to her employment be resolved by

13  confidential and binding arbitration.  (Dkt. No. 24-2 at 12-13.)  Defendants move to compel

14  arbitration as this lawsuit indisputably relates to her employment with the Company.

15      "Where a contract contains an arbitration clause, courts apply a presumption in favor of

16  arbitrability as to particular grievances, and the party resisting arbitration bears the burden of

17  establishing that the arbitration agreement is inapplicable."  *Wynn Resorts, Ltd. v. Atl.-Pac. Cap.,*

18  *Inc.*, 497 F. App'x 740, 742 (9th Cir. 2012).  So, Plaintiff bears the burden to show the arbitration

19  agreement is inapplicable.  Plaintiff posits two theories of inapplicability: (1) the agreement is

20  unenforceable pursuant to California Code of Civil Procedure § 1281.98, and (2) she has elected to

21  invalidate the agreement pursuant to the EFAA [2]

22  _____

23  [2] In her initial briefing, Plaintiff also alleged the arbitration agreement was both procedurally and
    substantively unconscionable.  Because the contract is "a negotiated employment agreement for a

24  top level executive . . . . the instant case falls closer to that end of the procedural unconscionablity
    spectrum where contracts have been freely negotiated by roughly equal parties[.]"  *Farrar v.*

25  *Direct Com., Inc.*, 9 Cal. App. 5th 1257, 1266 (2017).  "Contracts of adhesion that involve
    surprise or other sharp practices lie on the other end of the spectrum."  *Baltazar v. Forever 21,*

26  *Inc.*, 62 Cal. 4th 1237, 1244 (2016).  Plaintiff neither alleges nor argues she was surprised by the
    arbitration provision, and she fails to provide "evidence of 'oppression' or 'sharp practices,' on the

27  part of the company."  *Farrar*, 9 Cal. App. 5th at 1269.  As to substantive unconscionability, the
    EFAA did not make it illegal for a company to include in an employment contract an arbitration

28  provision seeking to cover sexual harassment claims.  Instead, the Act allows plaintiffs to pursue
    claims of sexual assault or harassment in court notwithstanding an arbitration provision.  The

United States District Court
Northern District of California

## I.    Section 1281.98

Under California Code of Civil Procedure § 1281.98, "if the fees or costs required to continue the arbitration proceeding are not paid within 30 days after the due date, the drafting party is in material breach of the arbitration agreement" and waives its rights to compel arbitration. The statute's purpose is to avoid an employee or consumer being forced into arbitration while the company "stalls or obstructs the arbitration proceeding by refusing to pay the required fees." *Gallo v. Wood Ranch USA, Inc.*, 81 Cal. App. 5th 621, 634 (2022) (citing Assem. Floor Analysis, 3d reading analysis of Sen. Bill No. 707 (2019–2020 Reg. Sess.) as amended May 20, 2019, p. 2). Under California law, this statute is "strictly applied" so that even if the company makes "the payment a few days after the expiration of the 30-day time limit," a material breach has occurred. *Keeton v. Tesla, Inc.*, 103 Cal. App. 5th 26, 33 (2024) (citing *De Leon v. Juanita's Foods*, 85 Cal. App. 5th 740, 753 (2022) and *Doe v. Superior Ct.* 95 Cal. App. 5th 346, 357-58 (2023)).  Because Defendants paid the second arbitration fee four days too late, they do not dispute that if Section 1281.98 applies, then by its plain language Plaintiff could withdraw from arbitration.  Instead, they argue California Code of Civil Procedure § 1281.98 is preempted by the New York Convention and the FAA, 9 U.S.C. § 2.  The Court agrees.

### A.  New York Convention Preemption

"The New York Convention and its implementing legislation emphasize the need for uniformity in the application of international arbitration agreements."  *Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1168 (9th Cir. 2021).  If an arbitration agreement falls under the Convention, courts must order arbitration unless the agreement is found to be "null and void, inoperative or incapable of being performed."  *CLMS Mgmt. Servs. Ltd. P'ship v. Amwins Brokerage of Georgia, LLC*, 8 F.4th 1007, 1016 (9th Cir. 2021) (citing 21 U.S.T. 2517).  "The limited scope of the Convention's null and void clause 'must be interpreted to encompass only

---

potential unenforceability of a provision does not make that provision substantively unconscionable.  *See Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1264 (9th Cir. 2017) ("Therefore, the unenforceability of the waiver of a PAGA representative action does not make this provision substantively unconscionable.").  Thus, the contract is neither procedurally nor substantively unconscionable and Plaintiff did not urge otherwise at either oral argument.

those situations—such as fraud, mistake, duress, and waiver—that can be applied neutrally on an

international scale.'" *Bautista v. Star Cruises*, 396 F.3d 1289, 1302 (11th Cir. 2005) (quoting

*DiMercurio v. Sphere Drake Ins. PLC*, 202 F.3d 71, 79 (1st Cir. 2000)); *see also Acab v.*

*Chenrosa LLC*, No. 3:23-CV-00994-BEN-AHG, 2024 WL 1283819, at *5 (S.D. Cal. Mar. 26,

2024) (same); *O'Keefe v. Holland Am. Line Inc.*, No. C22-1111-KKE, 2023 WL 8542570, at *5

(W.D. Wash. Dec. 11, 2023) (explaining a contract under the Convention can only be considered

"'null and void' due to fraud, mistake, duress, and waiver or other standard breach-of-contract

defenses 'that can be applied neutrally on an international scale.'").

      The New York Convention provides:

> An agreement or award arising out of such a relationship which is
> entirely between citizens of the United States shall be deemed not to
> fall under the Convention unless that relationship involves property
> located abroad, envisages performance or enforcement abroad, or has
> some other reasonable relation with one or more foreign states.

9 U.S.C. § 202.  To determine whether the Convention applies to an arbitration agreement courts

generally consider four factors: whether (1) the agreement is in writing within the meaning of the

Convention, (2) the agreement provides for arbitration in the territory of a signatory of the

Convention, (3) the agreement arises out of a legal relationship, and (4) a party to the agreement is

not an American citizen or the commercial relationship has some reasonable relation with a

foreign state.  *Balen v. Holland Am. Line Inc.*, 583 F.3d 647, 654-55 (9th Cir. 2009).

      The parties dispute whether the arbitration agreement satisfies the fourth factor.  It is

undisputed both parties are United States citizens; the disagreement concerns whether Plaintiff and

Defendants' commercial relationship bears some reasonable relation with a foreign state.  The

Ninth Circuit has yet to provide guidance on what constitutes a "reasonable relation" with a

foreign state.  The Fifth Circuit has held, "'reasonable relation' is . . . limited; it must be akin to

involving property located abroad or envisaging performance or enforcement abroad—that is, the

relationship must contemplate overseas action or involvement.  *Soaring Wind Energy, L.L.C. v.*

*Catic USA Inc.*, 946 F.3d 742, 752-53 (5th Cir. 2020) (cleaned up).

      Although Plaintiff was required to relocate to New York (Dkt. No. 24-2 at 4), her

employment contract provides Plaintiff's "primary office locations shall be [he]r home office in

United States District Court
Northern District of California

New York **and the Company's facilities in Shanghai, China**." (Dkt. No. 24-2 at 2 (emphasis added.)  An appendix attached to the contract lists "Examples of Duties of CFO", which include "Asia specific leadership" on "[i]nvestments, M&A and business development[,]" "strategic direction and planning[,]" "post deal integration and alliance management[,]" "marketing and communication[,]" and "government relations[,]" among others. (Dkt. No. 24-2 at 17.)  The contract also contemplates Plaintiff will be reimbursed for expenses related to "the performance of [her] duties" incurred during "extended business trips in China." (*Id*.)  So, the commercial relationship embodied in the contract bears some reasonable relation with a foreign state because the contract envisages Plaintiff's performance of her duties as Chief Financial Officer in Shanghai, China.

Plaintiff insists the contract does not fall under the Convention based on the analysis in *John Zhang v. Dentons U.S. LLP*, No. 2:21-CV-04682-RGK-JC, 2021 WL 2392169, at *3 (C.D. Cal. June 11, 2021).  In *John Zhang*, the court found the Convention did not apply to an employment agreement because it "d[id] not refer to a foreign place or entity" or "envision enforcement abroad." 2021 WL 2392169, at *3.  "All aspects of the [a]greement [were] domestic." *Id*.  In contrast, the contract here refers to a specific foreign place—Shanghai, China—and contemplates performance abroad. (*See* Dkt. No. 24-2 at 2, 17.)

Because the arbitration agreement falls under the New York Convention, it is unenforceable only if null and void due to defenses "such as fraud, mistake, duress, and waiver— that can be applied neutrally on an international scale." *Bautista*, 396 F.3d at 1302 (cleaned up).  Plaintiff argues Defendants materially breached the arbitration agreement by making a late payment and failing to comply with the agreement's "time is of the essence" provision.

While failure to pay an arbitrator or refusal to participate in arbitration can constitute waiver or breach of an arbitration agreement, these are traditionally fact-specific inquiries rather than bright-line rules. *See Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010-13 (9th Cir. 2005) (finding waiver and breach for refusal to pay arbitration fees and participate in arbitration); *Sink v. Aden Enters., Inc.*, 352 F.3d 1197, 1201 (9th Cir. 2003) (finding arbitration agreement unenforceable for failure to pay arbitration fees after arbitrator granted a motion for default); *see*

*also Eliasieh v. Legally Mine, LLC*, No. 18-CV-03622-JSC, 2020 WL 1929244, at *3 (N.D. Cal. Apr. 21, 2020) (collecting cases where the defendant's failure to pay the required fees leading to the termination of the arbitration was a material breach of the arbitration agreement.).  In most cases finding material breach for lack of payment, an arbitration provider terminates the proceedings after issuing several notices of unpaid fees.  *See id.*  "Absent a 'time is of the essence' clause, slow payment—as opposed to no payment at all—is not usually sufficient to constitute breach under general principles of California contract law." *Belyea v. Greensky, Inc.*, 637 F. Supp. 3d 745, 760 (N.D. Cal. 2022); *see also Edwards v. Symbolic Int'l, Inc.*, 414 F. App'x 930, 931 (9th Cir. 2011) ("Delay in performance is a material failure only if time is of the essence, i.e., if prompt performance is, by the express language of the contract or by its very nature, a vital matter.") (citing *Johnson v. Alexander*, 63 Cal. App. 3d 806, 813 (1976)).

The factual circumstances do not rise to breach of the arbitration agreement.  Defendants paid the fees before the arbitrator terminated the proceedings.  (Dkt. No. 24-28 at 2.)  And although Plaintiff argues the contract contains a "time is of the essence" provision, it does not.

> The general rule is that time is not of the essence unless it has been made so by the express terms of a contract or is necessarily so from the very nature of the contract.  In order to render time thus essential, it must be shown in clear, unequivocal and unmistakable language.

*Leiter v. Handelsman*, 125 Cal. App. 2d 243, 250 (1954); *see also Miller v. Cox*, 96 Cal. 339, 345 (1892) ("[I]t is not enough that a time is mentioned during which or before which something shall be done.").  The contract states, "[t]o ensure rapid and economical resolution of disputes that may arise in connection with your employment with the Company, you and the Company agree that any and all disputes. . . will be resolved pursuant to the Federal Arbitration Act."  (Dkt. No. 24-2 at 12.)  This language fails to unequivocally demonstrate an intent to make time the essence of the contract or provide any indication failure to pay arbitration fees by a certain date would violate the arbitration agreement.

Accordingly, Defendants' four-days late payment fails to render the arbitration agreement unenforceable under the New York Convention.

* * *

United States District Court
Northern District of California

1    Plaintiff's employment contract falls under the New York Convention because it envisages

2    Plaintiff's performance of her duties as Chief Financial Officer in Shanghai, China. The

3    arbitration agreement, which lacks a "time is of the essence" provision, is enforceable pursuant to

4    the New York Convention because Defendants' late payment does not constitute material breach.

5    Moreover, the New York Convention preempts Section 1281.98 because Section 1281.98 makes

6    arbitration agreements unenforceable on grounds exclusive to the arbitration context, *see infra* I.B,

7    and thus cannot be applied neutrally on an international scale. *See Bautista*, 396 F.3d at 1302.

8    **B.  Federal Arbitration Act § 2 Preemption**

9    The Federal Arbitration Act also preempts Section 1281.98. "The [Federal Arbitration

10   Act] contains no express pre-emptive provision, nor does it reflect a congressional intent to

11   occupy the entire field of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford*

12   *Junior Univ.*, 489 U.S. 468, 477 (1989). "Nonetheless, the [Federal Arbitration Act] may preempt

13   a state law under two circumstances." *Belyea*, 637 F. Supp. 3d at 755.

> First, under the "equal-treatment" principle, a court may invalidate or
> refuse to enforce an arbitration agreement based on "generally
> applicable contract defenses" like "fraud or unconscionability," but
> not on legal rules that "apply only to arbitration or that derive their
> meaning from the fact that an agreement to arbitrate is at issue."

17   *Id*. (quoting *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 650, *reh'g denied*, 143 S. Ct. 60

18   (2022)); *see also  Kindred Nursing Centers Ltd. P'ship v. Clark*, 581 U.S. 246, 252 (2017) (The

19   FAA preempts rules "too tailor-made to arbitration agreements—subjecting them, by virtue of

20   their defining trait, to uncommon barriers—to survive the [Federal Arbitration Act]'s edict against

21   singling out those contracts for disfavored treatment."). "Second, under 'obstacle preemption,' a

22   state law is preempted if it 'stands as an obstacle to the accomplishment and execution of the full

23   purposes and objectives of Congress' in enacting the [Federal Arbitration Agreement]." *Id*. The

24   law is preempted under the equal treatment principle.

25   California Code of Civil Procedure § 1281.98 "violates the equal-treatment principle under

26   9 U.S.C. § 2 because it makes arbitration provisions unenforceable on arbitration-specific

27   grounds." *Belyea*, 637 F. Supp. 3d at 756. Indeed, "the Legislature enacted section 1281.98 to

28   curb a particular arbitration abuse." *Hohenshelt v. Superior Ct.*, 99 Cal. App. 5th 1319, 1323

(2024), *review granted*, 549 P.3d 143 (Cal. June 12, 2024).  "The abuse was that a defendant could force a case into arbitration but, once there, could refuse to pay the arbitration fees, thus effectively stalling the matter and stymying the plaintiff's effort to obtain relief.  The Legislature called this 'procedural limbo.'"  *Id.* (cleaned up).  So, Section 1281.98's 30-day requirement modifies California contract law as to waiver and material breach—but only for arbitration agreements.  *See Cinel v. Barna*, 206 Cal. App. 4th 1383, 1390 (2012) ("[N]o single test delineates the nature of the conduct that will constitute a waiver of arbitration."); *see also Loral Corp. v. Moyes*, 174 Cal. App. 3d 268, 280 (Ct. App. 1985) ("The requirement of performance may be excused by the other party's breach.").  Indeed, as discussed in connection with the New York Convention, Defendants paying the arbitration invoice 34 days after first receiving it would not—as a matter of law—be a material breach of the arbitration agreement under generally applicable California contract law.  So, the law singles out arbitration agreements for unfavorable treatment and is thus preempted by the FAA.

Plaintiff insists the Federal Arbitration Act does not preempt Section 1281.98 based on California state court decisions holding state laws prescribing procedures that "*further*—rather than *frustrate*—the objectives of the [Federal Arbitration Act]" are not preempted. *See, e.g., Hohenshelt*, 99 Cal. App. 5th at 1325-26.  But "[t]he federal policy is about treating arbitration contracts like all others, not about fostering arbitration."  *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022).  Because Section 1281.98 makes arbitration agreements unenforceable on grounds exclusive to the arbitration context, it violates the equal-treatment principle under 9 U.S.C. § 2.  So, Section 1281.98 is preempted by the Federal Arbitration Act.  *See Belyea*, 637 F. Supp. 3d at 756-59.

Plaintiff also argues the contract's choice-of-law provision means California law, and not the Federal Arbitration Act, governs the arbitration agreement.  But the contract expressly provides "any and all disputes . . . will be resolved pursuant to the Federal Arbitration Act."  (Dkt. No. 24-1 at 12.)  And, in any event, "a general choice-of-law clause within an arbitration provision does not trump the presumption that the [Federal Arbitration Act] supplies the rules for arbitration."  *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1270 (9th Cir.), *opinion amended on*

10

1   *denial of reh'g*, 289 F.3d 615 (9th Cir. 2002).  Further, questions concerning the allocation of

2   power between courts and arbitrators, such as waiver of the right to compel arbitration based on a

3   material breach of an arbitration agreement, are controlled by the Federal Arbitration Act.  *Id.*

4   * * *

5   In sum, both the New York Convention and 9 U.S.C. § 2 preempt Section 1281.98.

6   Whether Plaintiff's lawsuit must be compelled to arbitration thus rests on whether the End Forced

7   Arbitration Act ("EFAA") applies.

8   **II.     The End Forced Arbitration Act**

9   The EFAA, which amends the Federal Arbitration Act, provides:

> Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, . . . no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

14  9 U.S.C. § 402(a).  A "sexual harassment dispute" means a dispute relating to conduct that is

15  alleged to constitute sexual harassment under applicable Federal, Tribal, or State law.  9 U.S.C. §

16  401(4).  The EFAA requires "invalidation of an arbitration agreement" upon the plaintiff's

17  election.  *Johnson v. Everyrealm, Inc.* 657 F. Supp. 3d 535, 559 (S.D.N.Y. 2023).  "The

18  applicability of this chapter to an agreement to arbitrate and the validity and enforceability of an

19  agreement to which this chapter applies shall be determined by a court, rather than an arbitrator."

20  9 U.S.C. § 402(b).  "The EFAA was enacted on March 3, 2022, and does not have retroactive

21  effect."  *Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917, 924 (N.D. Cal. 2023); *see* Pub. L. No. 117-90,

22  § 3, 136 Stat. 26, 28 (2022) ("This Act, and the amendments made by this Act, shall apply with

23  respect to any dispute or claim that arises or accrues on or after the date of enactment of this

24  Act.").

25  So, the first question is whether Plaintiff alleges a "sexual harassment claim" that arose or

26  accrued on or after March 3, 2022.

27  **A.  Plaintiff Plausibly Pleads a Sexual Harassment Claim**

28  Plaintiff asserts her California hostile work environment claim qualifies as a "sexual

United States District Court
Northern District of California

11

United States District Court
Northern District of California

harassment claim" under California law and therefore she can invoke the EFAA.[3]   California law

defines sexual harassment as "'harassment' because of sex" and it "includes sexual harassment,

gender harassment, and harassment based on pregnancy, childbirth, or related medical conditions.

Sexually harassing conduct need not be motivated by sexual desire."  Cal. Gov't Code §

12940(j)(4)(C).  And under California law, a hostile work environment claim exists when

"harassment has the purpose or effect of either interfering with the work performance of an

employee, or creating an intimidating workplace."  *Beltran v. Hard Rock Hotel Lic., Inc.*, 97 Cal.

App. 5th 865, 878 (2023) (quoting *Rieger v. Arnold*, 104 Cal. App. 4th 451, 459 (2002)).  To

establish a California hostile work environment claim, a plaintiff must allege the conduct "created

an intimidating, hostile, or offensive work environment" or otherwise "sufficiently offends,

humiliates, distresses, or intrudes upon its victim, so as to disrupt the victim's emotional

tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise

interfere with and undermine the victim's personal sense of well-being."  Cal. Gov't Code §

12923(b), (a). However, a victim of harassment must "subjectively perceive the environment to be

abusive" to state a claim.  *Aguilar v. Avis Rent A Car System, Inc.*, 21 Cal. 4th 121, 130 (1999)

*overruled in part by Bailey v. San Francisco District Attorney's Office*, 16 Cal. 5th 611 (2024)

(quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).  So, if Plaintiff plausibly pleads

a sex-based hostile work environment claim, she pleads a sex harassment dispute within the

meaning of the EFAA.  *See Turner*, 686 F. Supp. 3d at 926.

Plaintiff's second cause of action plausibly pleads a sex-based FEHA hostile work

environment claim and therefore pleads a claim covered by the EFAA.  Defendant Stevens

preferred to hire a man for the Chief Financial Officer position, but the Company's "Board of

Directors wanted to emphasize 'gender diversity' in its recruitment efforts to appeal to third-party

investors[.]"  (Dkt. No. 1 at 14-15 ¶¶ 16-17.)  So, Defendants recruited and hired Plaintiff as Chief

Financial Officer.  (*Id.* at 14 ¶ 19; 16-17 ¶¶ 27-28.)  When she started at the Company, Defendants

[3] Although in her initial opposition brief Plaintiff argued she plead a sexual harassment claim under New York law, she abandoned this argument in her supplemental briefing and at oral argument she conceded she failed to plead such a claim.  As such, the Court considers only the California claim.

12

1   ensured "nothing was 100% her responsibility" and it appeared as if "there [was] 'no need for

2   her.'"  (*Id*. at 17 ¶ 29.)  Instead of allowing Plaintiff to perform the primary functions of her

3   position, Defendant Stevens "directed her to read and listen for her first year in the Company."

4   (*Id*. at 18 ¶ 33.)  He further "narrowed [Plaintiff's] already limited scope of tasks to business

5   development in the Asian markets and limited investor outreach in Asia."  (*Id*. at 18-19 ¶ 34.)

6   Defendant Stevens told Plaintiff the Wall Street investment bankers servicing the Company's

7   Initial Public Offering complained Plaintiff "was 'too aggressive' and 'lectured' them," though he

8   later admitted none of these banks refused to work with Plaintiff or service the Company if

9   Plaintiff remained the Chief Financial Officer.  (*Id*. at 19 ¶ 35.)  When Plaintiff told Defendant

10  Stevens of the physical injuries she sustained when she suffered a domestic violence incident, he

11  said "I can hardly see anything.  You may be more sensitive to it than others."  (*Id*. at 23 ¶ 46.)

12  Days later, Defendant Stevens pressured Plaintiff not to attend executive meetings, asked her

13  repeatedly to reconsider her role as Chief Financial Officer in light of her domestic violence

14  incident, and recommended her termination to the Board.  (*Id*. at 23-24 ¶¶ 47-51.)

15          Drawing all reasonable inferences in Plaintiff's favor, Defendants' conduct polluted

16  Plaintiff's workplace by making it more difficult—in some instances, impossible—to do her job.

17  *See Mattioda v. Nelson*, 98 F.4th 1164, 1176 (9th Cir. 2024).  Defendants' conduct is plausibly

18  based on Plaintiff's gender, given Defendant Stevens preferred to hire a man but the Company

19  instead recruited and hired Plaintiff as Chief Financial Officer in the name of gender diversity.

20  Defendants' criticism Plaintiff was "too aggressive" for Wall Street investment bankers and knee-

21  jerk assumption Plaintiff would be too distracted from her domestic violence incident to fulfill her

22  role because she "might be more sensitive to [domestic violence] than others" further support the

23  inference Defendants' conduct toward Plaintiff was gendered.  So, Plaintiff plausibly pleads a

24  hostile work environment claim by alleging Defendants' gendered conduct interfered with her

25  ability to fulfill her role as Chief Financial Officer.  Under California law, Plaintiff has adequately

26  alleged a "sexual harassment dispute" such that the EFAA covers Plaintiff's claim.

27          Defendants' insistence Plaintiff cannot plead a California sexual harassment claim because

28  the record demonstrates she did not recognize Defendants' treatment of her was based on her

United States District Court
Northern District of California

13

gender until after her employment termination is not supported by California law. To the contrary, California law requires the plaintiff to "perceive the workplace as hostile or abusive," and that the plaintiff prove a "nexus between the alleged harassment and [the plaintiff's] gender," but Defendants do not cite any case holding the plaintiff is required to understand the basis for the hostility *at the time of* the harassment. The Ninth Circuit has held that sexual harassment in hostile work environment claims can be created when the employer's actions are not facially sex- or gender-related. *E.E.O.C. v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 844-847 (9th Cir. 2005); *see also Cozzi v. Cnty. of Marin*, 787 F.Supp.2d 1047, 1071 (N.D. Cal. 2011) (explaining that in *National Education Association of Alaska* "[t]he Ninth Circuit found that the supervisor's behavior, while not on its face sex-or gender-related, nonetheless met the 'severe and pervasive' test for the case to survive summary judgment."). Consistent with these cases, the Judicial Council of California Civil Jury Instructions (CACI) do not require the plaintiff be aware of the motive for the hostile work environment at the time of the abuse; instead, it requires, as follows:

> To establish this claim, [name of plaintiff] must prove all of the following: …
>
> 2. That [name of plaintiff] was subjected to harassing conduct because [he/she/nonbinary pronoun] was [protected status, e.g., a woman];
>
> 3. That the harassing conduct was severe or pervasive; …
>
> 5. That [name of plaintiff] considered the work environment to be hostile, intimidating, offensive, oppressive, or abusive..

CACI Instruction 2521 A. "Work Environment Harassment – Conduct Directed at Plaintiff – Essential Factual Elements – Employer or Entity Defendant (Cal. Gov'ty Code §§ 12923, 12940(j)) (2024). As Plaintiff pleads a FEHA hostile work environment claim based upon gender, and such a claim qualifies as a sexual harassment claim under California law, the EFAA applies to Plaintiff's case.

### B.  Plaintiff's Complaint is Not Too Late

The EFAA provides an arbitration agreement will not be valid "at the election" of a plaintiff alleging a sexual harassment claim. Defendants contend even if Plaintiff's complaint pleads a sexual harassment claim, it is too late for her to invalidate her arbitration agreement

United States District Court
Northern District of California

1   because *she* initiated arbitration in the first place.  While they concede her arbitration complaint

2   did not allege an EFAA-covered claim, they contend she still made an "election" to proceed in

3   arbitration rather than court and so she cannot now invoke the EFAA.  They argue in the

4   alternative that she waived her right to invalidate the arbitration agreement.

5                  **1.   EFAA Election**

6           In questions of statutory interpretation, a court must first "start with the statutory text."

7   *Tanzin v. Tanvir*, 592 U.S. 43, 46 (2020).  "Where a law is plain and unambiguous, whether it be

8   expressed in general or limited terms, the legislature should be intended to mean what they have

9   plainly expressed, and consequently no room is left for construction."  *BedRoc Ltd., LLC v. United*

10  *States*, 541 U.S. 176, 188 n. 8 (2004) (quoting *United States v. Fisher*, 2 Cranch 358, 399 (1805)

11  (C.J. Marshall)).  Thus, a court "must apply the statute according to its terms."  *Carcieri v.*

12  *Salazar*, 555 U.S. 379, 387 (2009).  "Only when statutes are ambiguous may courts look to

13  legislative history."  *Guido v. Mount Lemmon Fire Dist.*, 859 1168, 1170 n.1 (9th Cir. 2017).

14          Here, Congress did not define the term "election."  Dictionaries regularly define the term

15  as the exercise of a choice.  *See* "Election" Oxford English Dictionary, sense 2.a ("The exercise of

16  deliberate choice or preference; choice between alternative, *esp*. in matters of conduct."); *id.* at

17  sense 7.b (In law, "The choosing between two rights by a person who derives one of them under

18  an instrument in which a clear intention appears that he or she should not enjoy both."); *Election*,

19  Black's Law Dictionary (9th ed. 2009) ("The exercise of a choice; esp. the act of choosing from

20  several possible rights or remedies in a way that precludes the use of other rights or remedies.");

21  "Election," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/election

22  ("the right, power, or privilege of making a choice.").  And the EFAA's legislative history

23  indicates the law was intended to grant victims the choice between the arbitral forum and the

24  courts when seeking to redress sexual harassment in the workplace.  *See* House Report 117-234,

25  Jan. 28, 2022 "Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021"

26  at 4 (""H.R. 4445 would restore access to justice for millions of victims of sexual assault or

27  harassment who are currently locked out of the court system and are forced to settle their disputes

28  against companies in a private system of arbitration …").

United States District Court
Northern District of California

1       Congress therefore limited the ability of an employer to change the forum that a victim

2   chose to resolve the dispute.  *See* 168 Cong. Rec. H983-09, H985 (statements of Rep. Nadler)

3   ("H.R. 4445 removes these barriers to justice for survivors of sexual assault or sexual harassment

4   by giving them a real choice of whether to go to court or to arbitrate their claim."); *id.* at H987

5   (statements of Rep. Griffith) ("[T]his act will do it once and for all, … they will have a choice

6   instead of having to go in front of Company-picked arbiters who will make a decision for them

7   that will affect them the rest of their lives."); *id.* at H989 (statements of Rep. Buck) ("… [EFAA]

8   empowers rape victims to make a choice between arbitration and going to court."); *id.* at H992

9   (statements of Rep. Lee) (" … [The EFAA] is a bipartisan and bicameral legislation that

10  empowers survivors of sexual assault and sexual harassment by giving them a choice to go to

11  court instead of being forced into arbitration.").  Congress thus contemplated that a plaintiff would

12  "elect" to invalidate a forced arbitration clause at the time the employer seeks to remove the case

13  from her preferred court forum.  *See* 168 Cong. Rec. H983-09, 988 (statements of Rep. Lee) ("By

14  ending forced arbitration in lawsuits involving these claims, survivors of sexual assault or sexual

15  harassment are empowered with making the decision on whether they wish to pursue legal action

16  against their assailants which often includes going to court to arbitrate their claims.").

17       Plaintiff filed this lawsuit in state court.  Defendants removed the lawsuit to federal court

18  and moved to compel arbitration.  In response, Plaintiff "elected," that is, she chose, to invalidate

19  the arbitration agreement.  So, her procedural conduct falls squarely within the EFAA.  No

20  language in the EFAA says once a plaintiff initiates arbitration she cannot file a lawsuit in court

21  and "elect" to invalidate the arbitration agreement.  Congress could have so limited the EFAA, but

22  it did not do so.

23       Defendants' insistence Plaintiff elected to proceed in arbitration, that is, made a choice

24  under the EFAA, might have some force if her arbitration complaint included a claim covered by

25  the EFAA; if she had, she would have had a choice to file in court or file in arbitration at the time

26  she initiated arbitration.  But she did not make such a claim in arbitration.  So, she complied with

27  the exclusive and binding arbitration clause in her agreement and initiated arbitration.  She could

28  not "elect" to invalidate the arbitration agreement until she made an EFAA covered claim, which

                                          16

1  she did not do until she filed in court.  So, the EFAA itself does not prohibit her election in

2  response to Defendants' motion to compel.

3          **2.  EFAA Waiver**

4          The next question is whether Plaintiff nonetheless waived her EFAA right to invalidate the

5  arbitration agreement by initiating arbitration and proceeding in arbitration for one year before

6  filing a complaint in state court with a sexual harassment claim.  Waiver is the "intentional

7  relinquishment or abandonment of a known right."  *United States v. Olano*, 507 U.S. 725, 733

8  (1993).  Statutory rights are presumptively waivable.  *See United States v. Mezzanatto*, 513 U.S.

9  196, 200-01 (1995) ("Rather than deeming waiver presumptively unavailable absent some sort of

10  express enabling clause, we instead have adhered to the opposite presumption."); *Stern v.*

11  *Marshall*, 564 U.S. 462, 480 (2011) (ruling litigant forfeited a statutory right, noting the litigant

12  "does not explain why that statutory limitation may not be [] waived."); *Bobka v. Toyota Motor*

13  *Credit Corp.*, 968 F.3d 946, 954 (9th Cir. 2020) ("[A]bsent some affirmative indication of

14  Congress' intent to preclude waiver, statutory provisions are subject to waiver by voluntary

15  agreement of the parties."); *Buckley v. Gallo Sales Co.*, 949 F. Supp. 737, 742 (N.D. Cal. 1996)

16  ("An individual may waive his or her statutory rights unless Congress has expressed the intent that

17  the right may not be relinquished.").

18          "[V]oluntary initiation of arbitration can be interpreted as waiver of any objection [the

19  plaintiff] may have had over the authority of the arbitrator."  *Nghiem v. NEC Elec., Inc.* 25 F.3d

20  1437, 1440 (9th Cir. 1994).  "A claimant may not voluntarily submit his claim to arbitration, await

21  the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrators to

22  act."  *Ficek v. Southern Pac. Co.*, 338 F.2d 655, 657 (9th Cir. 1964).  But not all participation in

23  arbitration proceedings constitutes a waiver of a challenge to arbitrability.  *See First Options of*

24  *Chicago, Inc. v. Kaplan*, 514 U.S. 938, 946 (1995) (holding the plaintiffs did not waive their

25  challenge to arbitrability by filing written objections before the arbitration panel because it did not

26  "indicate a clear willingness to arbitrate that issue"); *see also Plan for Pension Trust Fund for*

27  *Operating Engineers v. Weldway Const. Inc.*, 920 F. Supp. 2d 1034, 1047 (N.D. Cal. 2013) ("not

28  all participation in arbitration waives a party's objection to arbitration").

United States District Court
Northern District of California

1    The Court finds Plaintiff did not waive her right to elect to bring a sexual harassment claim

2    in court by initiating arbitration on claims not covered by the EFAA.

3    First, while the parties were in arbitration for almost a year, they were still in discovery

4    and no merits hearings had been held.   (Dkt. 24-7 ¶ 14-16; Dkt. 24-20.)  So, Plaintiff did not

5    withdraw from arbitration on the eve of an unfavorable decision.  To the contrary, the only

6    arguable merits decision was the arbitrator's *denial* of Defendants' motion to dismiss the New

7    York claims.  The facts here are thus distinguishable from those cases finding the plaintiff's

8    initiation of arbitration waived the right to proceed in court.  *See PowerAgent Inc. v. Electronic*

9    *Data Systems Corp.*, 358 F.3d 1187, 1192 (9th Cir. 2004) (waiver found when the plaintiff waited

10   to seek to litigate in court only *after* it had already received an unfavorable outcome in

11   arbitration);  *Fortune, Alsweet and Eldridge, Inc. v. Daniel*, 724 F.2d 1355, 1356-57 (9th Cir.

12   1983) (holding the plaintiff waived the right to challenge arbitrability by waiting until the

13   arbitrator had already begun its merits hearing and anticipating a negative result).

14   Second, the record does not support a finding Plaintiff intentionally chose not to bring a

15   sexual harassment claim when she initiated arbitration.  In cases involving waiver of the right to

16   arbitrate, courts focus on the parties' "knowledge of an existing right to compel arbitration" as

17   well as the parties' actions and any consequent prejudice.  *See Morgan Stanley & Co., LLC v.*

18   *Couch*, 134 F. Supp. 3d 1215, 1228 (E.D. Cal. 2015) (quoting *Fisher v. A.G. Becker Paribas, Inc.*,

19   791 F.2d 691, 694 (9th Cir. 1986)).  Although Plaintiff was aware of sufficient facts to conclude

20   she was the victim of a hostile work environment, she contends she did not have sufficient

21   knowledge at the time of initiating arbitration to know she had a sexual harassment claim.

22   Plaintiff argues, "[i]t was not until the Company produced [] discovery *after* Dr. Ding withdrew

23   from the arbitration, [*sic*] that Dr. Ding learned that the harassment she experienced at work was

24   based on her sex and sexism."  (Dkt. No. 25 at 16.)  In this document production, Plaintiff

25   discovered a letter detailing Defendant Stevens's preference for a male phenotype in the search for

26   a Chief Financial officer.  (Dkt. No. 1 at 14 ¶ 16.)  Though Defendant Stevens's pre-termination

27   conduct informs the hostile work environment analysis—such as his criticizing her for being too

28   aggressive, saying she is too sensitive to domestic violence, and pressuring her to leave her

United States District Court
Northern District of California

18

1    position based on the domestic violence incident—Plaintiff insists she did not understand that this

2    harassment was *because of her sex* until she discovered a potential sexist motive for this conduct

3    in post-arbitration discovery.  In light of this evidence, the Court does not find Plaintiff "knew"

4    she had a plausible sexual harassment claim but chose not to make it, especially given Defendants

5    do not suggest there would be any tactical reason for Plaintiff to not assert such a claim if she

6    believed she could allege one.

7         Third, even if a plaintiff subjectively believes she could plausibly allege a claim covered

8    by the EFAA, she may initially be reluctant to make such a claim.  For example, she may sue for

9    wrongful termination, and allege the termination was based on gender discrimination, while also

10   believing it was because her supervisor sexually harassed her. Since she has a binding arbitration

11   agreement with her employer, and gender discrimination is not covered by the EFAA, she brings

12   her complaint in arbitration.  Before the arbitration proceeds to the merits, however, other women

13   come forward and accuse the supervisor of sexual harassment. Now the plaintiff feels comfortable

14   making the allegation as well and so withdraws from arbitration and files a complaint in court.

15   When the defendants move to compel arbitration, she elects her right under the EFAA to

16   invalidate the arbitration agreement.  Under Defendants' waiver theory, she would have waived

17   her right to bring her claims in court.  But that theory does not give enough deference to the

18   reasons Congress enacted the EFAA in the first place.

19        The Court is not holding that a plaintiff may never waive the EFAA right to invalidate an

20   arbitration agreement.  Its holding is that under the unique facts of this case, Plaintiff did not

21   waive the right Congress gave plaintiffs alleging sexual harassment to have their claims heard in

22   court rather than in confidential proceedings.

23        **C.    The EFAA Requires the Entire Case Proceed in Court**

24        Having held the EFAA applies to the present matter and Plaintiff timely elected to litigate

25   her sexual harassment claims in court, the Court must now determine whether it must sever and

26   remand Plaintiff's non-sexual-harassment-claims to arbitration or whether the entire case stays in

27   federal court.

28        The EFAA states that it is "enforceable with respect to a *case* which . . . relates to the

19

sexual assault dispute or the sexual harassment dispute." 9 U.S.C. § 402(a) (emphasis added). The statute's language, by its plain terms, is not limited only to "claims" or even only to "sexual harassment claims." Instead, Congress used the broader word "case" and qualified it with "relates." That Congress intended to distinguish "claim" from "case" is further bolstered by its use of the word "claim" in describing the non-retroactivity of the Act. *Compare* 9 U.S.C. § 402(a) ("enforceable with respect to a case …"); *with* Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022) ("This Act, and the amendments made by this Act, shall apply with respect to any dispute or claim that arises or accrues on or after the date of enactment of this Act."); *see Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2000) ("When Congress includes particular language in one section of a statute but omits it in another, th[e] Court presumes that Congress intended a difference in meaning.") (cleaned up). And because the FAA generally permits claims be compelled to litigation on a piecemeal basis, *see KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011) ("[I]f a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration even if this will lead to piecemeal litigation"), Congress would have understood that section 402(a)'s command would override the statutory scheme. So, when a complaint includes at least one EFAA covered claim, and the plaintiff elects to invalidate the arbitration agreement, the agreement is invalid as to the whole "case" to the extent the claims relate to the EFAA-covered dispute. *See Johnson*, 657 F. Supp. 3d at 559 ("the text of § 402(a) makes clear that its invalidation of an arbitration agreement extends to the entirety of the case relating to the sexual harassment dispute, not merely the discrete claims in that case that themselves either allege such harassment or relate to a sexual harassment dispute (for example, a claim of unlawful retaliation for a report of sexual harassment)."); *see also Liu v. Miniso Depot Ca, Inc.*, B338090, --- Cal. Rptr. ---, 2024 WL 4446693, at *6 (Cal. App. 2d Dist. Oct. 7, 2024) ("Thus, under the EFAA, [the plaintiff] may not be compelled to arbitrate any of her claims because the 'case' she filed under state law (her superior court lawsuit) 'relates to … the sexual harassment dispute' in that her complaint contains claims premised on conduct that is alleged to constitute sexual harassment under state law.").

Here, Plaintiff's non-sexual-harassment claims are based upon the same underlying facts as her sexual harassment claim. (Dkt. 1 at 13-14 ¶¶ 14-17; 18-22 ¶¶ 32-42; 22-26 ¶¶43-55.) So, they

all relate to her sexual harassment claim. *Compare with Mera v. SA Hospitality Group, LLC*, 675 F. Supp. 3d 442, 448 (S.D.N.Y. 2023) (finding the plaintiff's wage-and-hour claims severable brought on behalf of "all non-exempt employees" were severable because they "do not relate in any way to the sexual harassment dispute."). In *Johnson*, for example, the plaintiff brought claims for race discrimination, sexual harassment, and gender discrimination, just as Plaintiff does here. *Johnson*, 657 F. Supp. 3d at 546-47. The court did not compel arbitration of the non-EFAA claims because the statute requires "invalidation of an arbitration agreement [] to the entirety of the case *relating to the sexual harassment dispute*, not merely the discrete claims in that case that themselves either allege such harassment or relate to a sexual harassment dispute." *Id.* at 559. In *Turner*, the court refused to sever the plaintiff's claims for unlawful retaliation and failure to pay wages. *Turner* 686 F. Supp. 3d at 927-928. The court reasoned these related to the plaintiff's sexual harassment claims because at least one motivating factor in the retaliation claim related to sexual harassment and the harassment further resulted in her termination which underpinned her wages claim. *Id.* It is apparent that none of Plaintiff's asserted claims is so unrelated from the underlying sexual harassment facts as to require severing and remanding the claim. Indeed, Defendants do not argue that the Court should do so.

The Court therefore concludes the arbitration is unenforceable as to all Plaintiff's causes of action since they all relate to her sexual harassment dispute.

### C. Leave to Amend the Complaint

Defendants have the right to appeal the Court's denial of their motion to compel arbitration. *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 738 (2023) ("When a federal district court denies a motion to compel arbitration, the losing party has a statutory right to an interlocutory appeal."). And, if Defendants ask to have the trial court proceedings stayed pending the appeal, the case must be stayed. *Id.* at 747. In light of that likely delay, the parties—and the interests of justice—are best served by having the case in a posture in which the Court of Appeals either affirms the denial of the motion to compel, and then the case proceeds in court, or directs that the case be compelled to arbitration. Although the Court has concluded that drawing all inferences in Plaintiff's favor her complaint alleges a sexual harassment claim under California law, Defendants

disagree.  If the Court of Appeals agrees with Defendants, then it is likely to remand and the Court would then be required to give Plaintiff leave to amend to try again since she has had no opportunity to amend her complaint.  If the Court had agreed with Defendants that Plaintiff's complaint did not plausibly allege a sexual harassment claim, it would have given Plaintiff leave to amend to fully set out her allegations (and causes of action) to support her assertion she has EFAA covered claims.  *See Yost v. Everyrealm, Inc*., 657 F. Supp. 3d 563, 576 (S.D.N.Y. 2023) (authorizing the plaintiff to file an amended complaint that would fully set out the facts in support of her claims of sexual harassment before resolving whether she could invoke the EFAA to defeat the defendants' motion to compel arbitration).

Accordingly, the parties shall meet and confer on whether Plaintiff wishes to file an amended complaint that fully sets forth her sexual harassment factual allegations and causes of action and, if so, how best to proceed.

## CONCLUSION

Plaintiff did not waive her right to invalidate the arbitration agreement under the End Forced Arbitration Act.  Further, all of Plaintiff's causes of action relate to the underlying sexual harassment dispute covered by the EFAA.  Because Plaintiff timely elected to pursue her case in court, the Court is prepared to deny the motion to compel arbitration.  But, as explained above, Plaintiff may wish to amend her complaint.

The Court will hold a further case management conference on November 14, 2024 at 1:30 p.m. via Zoom video.  A joint statement that addresses any proposals for how to proceed in light of this Order shall be filed by noon on November 12, 2024.  In the meantime, the Court defers final ruling on the pending motion to compel arbitration.

**IT IS SO ORDERED.**

Dated: October 29, 2024

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California

22